2022 IL App (1st) 170267-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
June 21, 2022

No. 1-17-0267

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF ELIZABETH JEAN HARPER, an alleged disabled person, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| (Mary Growe, petitioner-appellee and cross-appellant, J. Matthew Pfeiffer, Esq., cross-appellant, Kevin Edward White, cross-petitioner-appellant and cross-appellee, and Elizabeth Jean Harper, respondent-appellant and cross-appellee). | ) ) ) ) ) ) ) | No. 13 P 3158<br><br>The Honorable Carolyn Quinn, Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Trial court did not err in dismissing motion for sanctions for lack of jurisdiction on the basis that it was not filed within 30 days of final judgment in the case.

¶ 2    This cross-appeal arises out of an intrafamily dispute concerning the proper party to act as either power of attorney or guardian on behalf of Elizabeth Jean Harper (Harper), an alleged disabled person. The primary parties to this litigation are two siblings, Mary Growe (Growe) and Kevin Edward White (White), who are Harper's niece and nephew. The principal issue in the litigation was Harper's legal capacity to execute two Illinois Statutory Short Form Powers of Attorney on March 18, 2013 (the 2013 POAs). One was for health care and appointed White as

Harper's agent to make decision for her concerning her personal and medical care; the second was for property and appointed Sarah L. Esmond as Harper's agent in that regard. Both of the 2013 POAs revoked prior powers of attorney that had been executed by Harper, specifically two Illinois Statutory Short Form Powers of Attorney that Harper had executed on August 2, 2001 (the 2001 POAs). Those 2001 POAs had appointed Helen White (Helen) as Harper's agent for health care and property, and it appointed Growe as successor agent for health care. Helen, who passed away in 2013, is the mother of Growe and White and the sister of Harper. Alvin White (Alvin) was Helen's husband and the father of Growe and White.

¶ 3    On appeal, White and Harper argue that the trial court erred in dismissing their posttrial motion for sanctions on the basis that it was untimely filed more than 30 days after final judgment. On cross-appeal, Growe argues that the trial court erred by granting a motion for directed finding against her on her claim that Harper lacked capacity to execute the 2013 POAs and thereby revoke the 2001 POAs, and Growe and her attorney, J. Matthew Pfeiffer (Pfeiffer), argue that the trial court abused its discretion by dismissing their motion for sanctions also.

¶ 4                                    I. BACKGROUND

¶ 5                            A. Pleadings and Procedural History

¶ 6    The litigation commenced on May 31, 2013, when Growe and Helen filed a petition for the appointment of a guardian of a disabled person for Harper, then age 87, on the basis of Harper's alleged "mental deterioration, severe cognitive impairment, and limited physical capabilities." That petition alleged that Harper had appointed agents under the Illinois Power of Attorney Act (755 ILCS 45/1-1 *et seq.* (West 2012)) but that the identity of those agents was "in dispute." After the filing of the petition, the trial court appointed Kerry R. Peck to serve as guardian *ad litem* (GAL) on behalf of Harper. Helen died shortly after the filing of the petition.

¶ 7    On January 24, 2014, Growe filed a second amended petition for relief under the Illinois Power of Attorney Act (*id.*), which is one of the operative pleadings on which the case proceeded to trial. It raised a challenge only to the power of attorney for health care. In it, Growe sought a finding under section 2-10(a) of the Illinois Power of Attorney Act (*id.* § 2-10(a)), that Harper lacked capacity to control or to revoke the 2001 POA for health care and to implement the 2013 POAs. It also sought an order declaring Growe as Harper's agent for health care, based on the 2001 power of attorney for health care.

¶ 8    Separately, on August 21, 2013, White filed a cross-petition for the appointment of a guardian for Harper, requesting that he be appointed guardian of Harper's estate and person. Additionally, on March 10, 2014, White filed an answer to Growe's second amended petition for relief under the Illinois Power of Attorney Act, in which he asserted by way of affirmative matter, that Growe was not qualified to serve as Harper's power of attorney for health care, based in part on Growe's plans to move Harper from her longtime home in Sokie to Growe's home in rural Wisconsin.

¶ 9    Generally speaking, the record throughout this time reflects a recognition by the parties and the trial court that provisions of the Illinois Power of Attorney Act (*id.* § 1-1 *et seq.*) and the Probate Act of 1975 (755 ILCS 5/1-1 *et seq.* (West 2012)) precluded the appointment of any guardian for Harper if she had made any valid appointment of an agent as power of attorney, whether under the 2013 POAs or the 2001 POAs. See 755 ILCS 45/2-10(g) (West 2012) ("Absent court order directing a guardian to exercise powers of the principal under the agency, a guardian will have no power, duty or liability with respect to any property subject to the agency or any personal or health care matters covered by the agency"); 755 ILCS 5/11a-17(c) (West 2012) ("Absent court order pursuant to the Illinois Power of Attorney Act directing a guardian to exercise powers of the principal under an agency that survives disability, the guardian has no power, duty,

or liability with respect to any personal or health care matters covered by the agency"); *id.* § 11a-18(e) (similar provision to section 11a-17(c) concerning "any property subject to the agency").

¶ 10       Accordingly, on March 20, 2014, the parties appeared in court to discuss the order and manner in which the issues of the validity of the powers of attorney and the appointment of a guardian would be resolved at trial. The trial court stated that the "threshold issue" would be whether Harper had legal capacity to execute the 2013 POAs. The court went on to state that, if Harper had the legal capacity to do that and thereby to revoke the 2001 POAs, "then I think the only other issue that remains is whether the agent under [the 2013 POAs] is fulfilling his obligation. *** [I]f the finding is yes to that, then we're done." The court further explained that, if it found that Harper lacked capacity to execute the 2013 POAs, "then we go back to the 2001 [POAs], and the question is: Assuming capacity to grant that power of attorney[,] are the obligations of that agent being fulfilled as they should be? If the answer is yes, we're done." The court then stated in conclusion, "So it's really only if I find that there's no valid power of attorney of either year to enforce that we then proceed to the cross petitions for guardianship."

¶ 11       This was memorialized by the trial court's written order entered on March 25, 2014, which provided that (1) the court would conduct an evidentiary hearing "with respect to the validity of the 2013 Powers of Attorney, including, but not limited to, a determination as to whether or not Ms. Harper was competent to execute the 2013 Powers of Attorney;" (2) "if necessary, conduct an evidentiary hearing to determine whether or not the 2013 Power of Attorney is being properly exercised;" (3) "if necessary, conduct an evidentiary hearing with respect to whether or not the 2001 Power of Attorney for Health Care is being properly exercised;" and (4) "if necessary, conduct an evidentiary hearing with respect to the appointment of a guardian for Ms. Harper."

¶ 12       The issue arose again on May 5, 2014, when, in a discussion about narrowing the issues to

be tried, the court questioned the attorneys about whether the case would ultimately turn on the issue of the best health care plan for Harper, regardless of the court's determination about Harper's legal capacity to execute the 2013 POAs. With respect to order of March 25, 2014, White's attorney stated that the sequence of issues had been set forth in it "more out of a sequence of logic *** than any pleadings. And that's why the phase 'if necessary' was *** in both of these." White's attorney pointed out that no issue involving the health care that Harper was presently receiving had ever been raised in any pleading, by either Growe or the GAL. The trial court stated that it understood that that fact, but nevertheless it anticipated an issue to be raised regarding the existing plan of care for Harper "based on statements of everyone in court over all of these hearings." At the conclusion of that hearing, the parties indicated that they wished to proceed to trial concerning the validity of the 2013 POAs instead of agreeing to resign their respective agency appointments to allow the case to proceed directly to the issue who should serve as guardian for Harper.

¶ 13      On May 7, 2014, as the bench trial was partially underway in this case, the GAL was granted leave to file a separate petition to appoint a third party as independent guardian of Harper's person. The GAL informed the trial court that he was doing so because of the "palpable tension" shown by the parties at trial and the fact that no matter who won, future cooperation among the family seemed unrealistic. The trial court stated that whether the GAL's petition ever needed to be addressed would depend on the outcome of the hearing on the powers of attorney. On September 25, 2014, the GAL filed an amended petition for the appointment of a guardian of Harper, seeking to have independent third parties appointed as guardian of Harper's person and of her estate.

¶ 14                                     B. Bench Trial

¶ 15      Susan Dawn testified at trial that she is an attorney specializing in estate planning who first met Harper in 2001 to prepare a will, trust, and powers of attorney for her. In 2013, John Kelty,

Harper's financial adviser, requested that Dawn talk with Harper again about whether she wanted to make changes to her estate plan. When they spoke, Harper told her about an unexpected incident in which Helen, Alvin, and Growe had come to Illinois to take Harper to lunch and ended up driving her back to Wisconsin. They wanted her to move to there. She told them that she did not want to and wanted to be taken home. Harper was quite angry about it. On March 8, 2013, Dawn and Kelty met with Harper at her house. They discussed family pictures, with Dawn confirming that Harper knew who everyone was. In that discussion, Dawn asked Harper if she would prefer to have White act as her power of attorney for health care, and Harper stated that was what she wanted. As they were talking that day, Dawn was evaluating whether Harper had the level of competence necessary to make decisions about who she wanted to help her, by ensuring that was making appropriate eye contact, following the conversation, and expressing understanding appropriately. At no point during her interaction with Harper that day did Dawn get the impression that Harper was not competent or did not understand what was happening and being discussed. Dawn thereafter prepared documents reflecting their conversation. She presented these to Harper at a meeting at her house the next week. They went through the documents together and confirmed that they reflected the changes she had wanted to her power of attorney, such that White, not Helen, would be primarily responsible for making medical decisions for her. Dawn witnessed Harper sign the document, and Dawn had no concern at that time about whether Harper was of sound mind.

¶ 16        Dawn's husband, Richard Gonzalez, testified that he was present as a witness to Harper's signing of the powers of attorneys in 2013. Nothing Harper did or said that day raised any concerns in his mind that Harper did not know what was going on. She seemed to be paying attention and to comprehend what was being said.

¶ 17        John Kelty testified, although the full transcript of his testimony is not included in the record

on appeal. According to the trial court's summarization of his testimony in its ruling on the motion for directed finding, Kelty testified that he is Harper's financial advisor and has known her since 1987. He visited Harper two times in January 2013. On both visits, Harper complained about the trip to Wisconsin, telling Kelty that Growe, Alvin, and Helen had taken her out on the guise of going to lunch but instead took her to a senior facility. She spoke about the incident for 15 minutes, was very upset about it, and wanted to make some changes. She asked him if something could be done to protect her and keep her in her home. Kelty later met with Dawn and Harper at her home in early March 2013. He observed Dawn and Harper review a large family photograph and discuss who might be good candidates to serve as successor power of attorney. On March 18, 2013, Kelty again met with Dawn and Harper at Harper's house. Dawn's husband was also there. Dawn read through the documents with Harper and explained them. With regard to the medical directives, Dawn read each option to Harper fully. After she read the first one, Harper identified that one as the one she wanted. Kelty believes that Harper was mentally competent in March 2013 when she executed the powers of attorney. He bases this opinion on his visits with her and her ability to recall events that occurred during that timeframe. For example, when signing Harper had asked whether she should sign as "Betty Jean" or "Elizabeth," which had been an ongoing issue in dealing with her since 1987. Also, she had recognized that Kelty's family Christmas card had arrived earlier than in past years and could identify Kelty's family members on the card. Her conversation with Dawn about the family photo and who could serve as power of attorney had been a normal conversation with a lot of detail on every topic.

¶ 18    Aaron C. Malina, Ph.D., testified that he is a board-certified clinical neuropsychologist who had first evaluated Harper in January 2013. She was referred to him for evaluation of her cognitive functioning by her primary care physician. Dr. Malina testified at length concerning the testing he

conducted on Harper that day on matters such as her orientation, comprehension, memory, organization and planning abilities, and visual processing. He testified that her test results showed a clinical pattern typical for a moderate stage of posterior cortical atrophy (PCA), which he described as a type of dementia related to Alzheimer's in which she was unable to process visual information perceived from the left side of her visual field. He testified that she could focus on something for a brief time but would rapidly forget information. He described her as having significant deficits in her language skills, executive functioning, ability to shift attention, organizing, and planning higher order thinking abilities.

¶ 19    Dr. Malina testified that, based on his evaluation of Harper in January 2013, she would not have had the capacity to understand the contents of the powers of attorney documents that she signed in March 2013. His basis for this opinion included the difficulties she experienced with left-sided visual perception and with retaining information that she read for long enough to make an informed decision about it. He testified that she "may have a general understanding that the purpose was to designate someone to help take care of her," but she lacked "the capacity to fully understand the meaning or implication of the overall document." He testified that if a person sat with Harper to go over the power of attorney and paraphrased it for her, Harper may have been able to understand either part of or the whole of the explanation, depending on the simplicity of it. However, he did not believe she would have been able to retain the information over the necessary period to make an informed decision about it.

¶ 20    Only a few pages of the testimony of Alvin are included in the record on appeal, but it was also summarized by the trial court in its ruling on the motion for directed finding. According to that summarization, Alvin testified that he had known Harper for 65 years. In 2011, he began noticing changes in Harper's mental capacity and her ability to remember things. In early 2013, he

and Helen took Harper to the Villa Rosa in Wisconsin. Harper was under the impression that Helen and Alvin were asking for her advice on the facility for themselves. Halfway through the interview, Harper realized what was occurring and clammed up. Helen refused to place Harper at Villa Rosa knowing she did not want to be there.

¶ 21     The testimony of Growe's husband, Mark Growe, is similarly not included in the record on appeal. According to the trial court's summarization, he testified that he had known Harper for 38 years and began to notice a change in her mental capacity in 2008 or 2009. She would seem disoriented and would answer questions in a general and nonspecific way, which was a change for someone he knew to be highly intelligent. Mark testified that Harper said nothing regarding the 2013 visit to the Villa Rose in Wisconsin.

¶ 22     Growe's own trial testimony is also only partially included in the record on appeal. In it, Growe testified at length about e-mail communications among herself and her siblings regarding Harper's declining condition in 2011-2012 and what needed to be done to provide for Harper's care. At that time, Growe believed that Harper needed 24-hour supervision but was not then receiving it from Growe's brother, Tom, who lived with Harper but was not there all the time, and from her caregivers. Growe wanted Harper to be in an environment of engagement, encouragement, and participation, and she was concerned that Harper's caregivers were not providing this kind of environment for her.

¶ 23     On cross-examination, Growe testified that she had accompanied Helen and Alvin in January 2013 when they took Harper to Wisconsin to visit the Villa Rosa facility. Prior to that day, Growe had not told Harper that she was going to take her to Wisconsin to show her an elder care facility. She did not know if her mother told her and doubts her father did. Growe testified that, the night before they went to the facility, she told Harper that they were going to look at an apartment for

Harper and her dog as a possible place to live. After the tour was over, Growe did not talk to Harper about leaving her home to relocate to the facility in Wisconsin. On redirect examination, Growe testified that Harper had a brief assessment by the manager of the senior living facility. Harper seemed to be tired from all the questioning, so Growe took it upon herself to stop the assessment. They then went to lunch, where Harper appeared to enjoy herself and did not seem distressed.

¶ 24    Nishad J. Nadkarni, M.D., testified by evidence deposition that he is a forensic psychiatrist who saw Harper on July 22, 2013, at the request of GAL Kerry Peck, to evaluate the necessity of a guardianship and her competency to independently manage her personal and financial affairs. In his report, he wrote that Harper was "totally incapable of making personal and financial decisions due to the severity of her PCA dementia." This is a form of Alzheimer's dementia that involves damage to the areas of the brain that enable a person to identify what he or she sees. He testified that she had symptoms and signs consistent with "a long history of this deterioration for many years." Dr. Nadkarni testified that, based on the fact that Harper's dementia had been progressing since 2009, his opinion to a reasonable degree of certainty was that she would not have been competent in March 2013 to understand the powers of attorney she was signing. The dementia she was experiencing by this time would not wax and wane over time in terms of capacity. On cross-examination, Dr. Nadkarni testified that he was aware that Harper was being treated by Dr. Marni Goldberg in March 2013, within days of her signing of the 2013 POAs, but he had never reviewed any of Dr. Goldberg's medical records, spoken to Dr. Goldberg, or reviewed her deposition testimony given with respect to Harper.

¶ 25                                C. Directed Finding

¶ 26    After Growe's attorney indicated that Growe was resting her case, White filed a motion for directed finding under section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West

2014)). In that motion, White argued that Growe had failed to make a *prima facie* showing that Harper lacked capacity to know and understand what she was doing when she executed the 2013 POAs. In response, Growe argued that she had demonstrated that Harper did not have the requisite mental capacity to effectuate the 2013 POAs. Specifically, she relied upon the testimony by Dr. Medina and Dr. Nadkari indicating that, in March 2013, Harper would not have understood what she was doing, the gravity of the documents she was signing, and what they meant.

¶ 27    The trial court granted the motion for a directed finding. After extensively reviewing the evidence that had been adduced during Growe's case-in-chief, the trial court determined that the evidence fell short of demonstrating by clear and convincing evidence that Harper lacked the capacity to understand the scope, effect, and character of her actions in executing the 2013 POA.

¶ 28    After granting the motion for directed finding, the trial court then stated that it had re-reviewed Growe's operative pleading and the "only reason stated for revocation in that petition appears to be lack of capacity. So that appears to conclude that petition." The court went on to state that, given its determination that the 2013 POAs were valid, sections 11a-17 and 11a-18 of the Probate Act (755 ILCS 5/11a-17, 11a-18 (West 2012)), along with "another section of the Power of Attorney Act that I'm drawing a blank on," would "preclude the petitions — the cross-petitions for guardianship from going forward at this point." The court then stated, "We have further petitions that need to be filed, fee petitions, I expect." The court directed the parties to prepare a written order and, in response to a question about how the guardianship petitions should be reflected in it, the trial court stated, "I think that if the finding is that there are valid powers of attorney in place and there is no other reason that's been requested under the pending 2-10 petition to seek to revoke those powers of attorney, then a guardian cannot be appointed under 11a-17, 11a-18 [of the Probate Act]. *** So I think it would be appropriate to dismiss them." The court

then stated that it was setting the matter for a 30-day status date for any fee petitions.

¶ 29    The written order that followed, entered on March 23, 2015, stated in pertinent part, "The Court having ruled that the March 2013 Powers of Attorney at issue herein are valid and enforceable, Petitioner's and Cross-Petitioner's respective petitions for guardianship of Elizabeth Jean Harper, Alleged Disabled Person, are dismissed." The order made no reference to the amended petition for guardianship filed by the GAL. The order further stated that any party intending to submit petitions for fees and expenses should submit such petitions forthwith and continued the matter for status on April 23, 2015.

¶ 30                    D. *Nunc pro tunc* dismissal of GAL's petition for guardianship

¶ 31    In the month between the entry of that order of March 23, 2015, and the status hearing of April 23, 2015, no motion or other document was filed other than a petition for fees by the GAL. Near the conclusion of the April 23 status hearing, Growe's attorney pointed out that the GAL's amended petition for guardianship was still outstanding and had not been addressed in the order of March 23, 2015. The trial court responded that the GAL's petition "absolutely should be dismissed" and that its dismissal "should be *nunc pro tunc* to the last date *** because that should have been included. I wasn't even thinking of that amended." The only other matter addressed on April 23 was the GAL's petition for fees. The trial court formally discharged the GAL and stated that nothing else was pending before the court.

¶ 32                                E. Motions for Sanctions

¶ 33    On May 7, 2015, White, on behalf of himself and Harper, filed a motion for sanctions against Growe and Pfeiffer. Generally speaking, that motion for sanctions asserted that a significant amount evidence existed (which would have been presented in White's case if the directed finding had not been granted) that overwhelmingly demonstrated Harper's capacity as of March 2013. It

asserted that if Growe and her attorney had properly investigated the facts available to them, they would have or should have recognized that no factual or legal basis existed for seeking to invalidate the 2013 POAs based on lack of capacity.

¶ 34    On June 2, 2015, Growe and Pfeiffer filed a separate motion for sanctions against White and Esmond (in her capacity as Harper's agent as power of attorney for property). In it, they asserted that the motion for sanctions filed by White was itself not well-grounded in fact or law and had been filed only to harass them.

¶ 35    Both motions were briefed and proceeding to hearing. On October 5, 2015, the trial court denied the motion filed by White, with the exception of three allegations. The court allowed discovery to proceed on those three paragraphs of allegations. Also, the trial court denied the motion for sanctions filed by Growe and Pfeiffer, stating that it "cannot conclude that there is no precedent for the position adopted by Mr. White and Ms. Esmond."

¶ 36    At a status hearing on December 17, 2015, the trial court *sua sponte* raised the question of its own jurisdiction to consider the motion for sanctions and whether it had been timely filed within 30 days of the entry of final judgment. The trial court invited the parties to brief the issue.

¶ 37    On April 1, 2016, the trial court entered a memorandum opinion and order in which it concluded that final judgment had been entered on March 23, 2015, when it had granted the motion for directed finding and ordered the petitions for guardianship be dismissed. As part of its ruling, the trial court reviewed the course of proceedings and concluded that, on April 23, 2015, it had properly ordered that dismissal of the GAL's amended petition for guardianship was *nunc pro tunc* to March 23, 2015. It also concluded that the finality of the order was not changed by the fact that the GAL filed a fee petition after March 23, 2015. Accordingly, because the motion for sanctions had not been filed within 30 days of the entry of that order, the trial court dismissed the petition

for sanctions for lack of jurisdiction.

¶ 38    On April 29, 2016, White and Harper filed a motion to reconsider the order of April 1, 2016. The motion was fully briefed, and on December 30, 2016, the trial court entered an order denying the motion to reconsider. On January 26, 2017, White and Harper filed a timely notice of appeal, and on February 3, 2017, Growe and Pfeiffer filed a notice of cross-appeal.

¶ 39                                    II. ANALYSIS

¶ 40                            A. Appeal by White and Harper

¶ 41    On appeal, White and Harper argue that the trial court erred in dismissing their motion for sanctions for lack of jurisdiction on the basis that it had been untimely filed more than 30 days after final judgment. They argue that the trial court erred in construing the order of March 23, 2015, as the final judgment. They contend that it was not final, because it resolved only one of the issues in the case, namely whether Harper possessed the requisite capacity to execute the 2013 POAs. They contend that other issues remained pending as of that time, including the GAL's amended petition for guardianship, the GAL's petition for legal fees and expenses, and other issues set forth in the order of March 25, 2014. Relatedly, they argue that the trial court erred when, on April 23, 2015, it ordered that the GAL's amended petition for guardianship was dismissed *nunc pro tunc* to March 23, 2015. Appellate jurisdiction exists over the question of whether jurisdiction existed in the trial court. *Kyles v. Maryville Academy*, 359 Ill. App. 3d 423, 431 (2005).

¶ 42    The motion for sanctions at issue was filed on May 7, 2015. After initially allowing three of the allegations raised in that motion to proceed, the trial court later raised the question of whether the motion had been timely filed under Illinois Supreme Court Rule 137(b) (eff. July 1, 2013) and concluded it had not. Rule 137(b) provides that a motion for sanctions "must be filed within 30 days of the entry of final judgment, or if a timely post-judgment motion is filed, within 30 days of

the ruling on the post-judgment motion." *Id.* If a motion for sanctions is not filed within the timeframe set forth in Rule 137(b), the trial court loses jurisdiction to award sanctions. *F.H. Prince & Co. v. Towers Financial Corp.*, 266 Ill. App. 3d 977, 988 (1994). Whether a trial court has jurisdiction to entertain a motion for sanctions is a question of law reviewed *de novo. Parker v. Liberty Insurance Underwriters, Inc.*, 2022 IL App (1st) 200812, ¶ 17.

¶ 43    A "final judgment" is a determination by the court on the issues presented by the pleadings that ascertains and fixes absolutely and finally the rights of the parties in the lawsuit. *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 47. A final judgment is one that finally determines the litigation on the merits, so that, if affirmed, the only thing remaining is to proceed with the execution of the judgment. *In re Michael D.*, 2015 IL 119178, ¶ 13.

¶ 44    In considering the argument of White and Harper on this issue, there appear to be three principal questions bearing on whether the order of March 23, 2015, constituted a final judgment in this case. First, was the finality of that order in affected by the fact that it expressly contemplated future petitions for attorney fees and expenses being filed in the case? Second, in the later order of April 23, 2015, did the trial court properly enter a *nunc pro tunc* dismissal of the GAL's amended petition for guardianship to March 23, 2015, such that the earlier order constitutes a final judgment? And third, did any other substantive issues remain to be resolved in the case once the trial court determined that Harper had the legal capacity to execute the 2013 POAs?

¶ 45                                *1. GAL's petition for fees*

¶ 46    As to the first question, we do not interpret the argument of White and Harper to be that the March 23 order's contemplation of future fee petitions was, standing alone, enough to render the order nonfinal. In its order dismissing White's petition for lack of jurisdiction, the trial court determined that that the GAL's fee petition was filed and resolved after March 23, 2015, did not

affect the finality of that order because the fee petition was "collateral to the judgment order entered on March 23." The trial court cited to a line of cases holding, in the context of appealability of final judgments, that a claim for attorney fees made after the resolution of the merits of the principal action is deemed incidental or collateral to the principal action and does not affect the finality of a judgment order entered in that action. See, *e.g.*, *Goral v. Kulys*, 2014 IL App (1st) 133236, ¶ 22; *In re Estate of Kunsch*, 342 Ill. App. 3d 552, 556 (2003); *Hartford Fire Insurance Co. v. Whitehall Convalescent & Nursing Home, Inc.*, 321 Ill. App. 3d 879, 886-87 (2001); *Servio v. Paul Roberts Auto Sales, Inc.*, 211 Ill. App. 3d 751, 759 (1991). It reasoned that a GAL's fee petition filed after the resolution of a guardianship proceeding would qualify as an action collateral to the principal action, since attorney fees are not considered an element of the cause of action, the awarding of fees is not necessary to the resolution of a guardianship, and fees are not mandatory under the statute. See 755 ILCS 5/11a-3, 11a-10(c) (West 2012).

¶ 47　　　Again, we do not interpret the argument by White and Harper to take issue with the analysis of the trial court on this point. We likewise agree with the trial court that any petitions for fees filed and resolved after March 23, 2015, were collateral to the principal action for guardianship. The fact that the trial court retained jurisdiction to resolve such fee petitions or that its March 23 order contemplated that they would be filed and resolved in the future was not, standing alone, enough to render interlocutory an order that would otherwise be final.

¶ 48　　　　　　　*2. Nunc pro tunc dismissal of GAL's amended petition for guardianship*

¶ 49　　　Our second principal question bearing on whether the March 23 order was a final judgment is whether, by the later order of April 23, 2015, the trial court properly entered a *nunc pro tunc* dismissal of the GAL's amended petition for guardianship to March 23, 2015, such that a final judgment existed in the case as of that earlier date. White and Harper argue that the trial court

misused the "*nunc pro tunc*" designation in this context, because neither the trial court nor any party was contemplating the dismissal of the GAL's amended petition for guardianship at the time the trial court originally made its ruling on March 23, 2015. White and Harper point out that the reason that the GAL filed a separate petition to appoint an independent third-party as guardian was because he believed that "palpable tension" existed among Harper's family members that would remain unresolved and adversely affect Harper's care, regardless of her competence to execute a power of attorney. Thus, White and Harper argue, there was no evidence that the parties ever assumed that the court's finding that Harper was competent to execute the 2013 POAs would negate the need for the GAL's amended petition for guardianship to be heard and decided.

¶ 50        A *nunc pro tunc* order may be used by a court to correct a clerical error in a written order and thereby make a final order entered in a case conform to the actual judgment of the court. *In re Marriage of Breslow*, 306 Ill. App. 3d 41, 50 (1999). The purpose of such an order is to supply some omission in the record of an order that the court actually made but that was omitted from the record at that time. *Deutsche Bank National Trust Co. v. Ivicic*, 2015 IL App (2d) 140970, ¶ 17. It does not alter the actual judgment entered by the court, but rather it corrects inadvertent omissions from the judgment order. *Id.* The *nunc pro tunc* designation may not be used if the omission is the result of a deliberate decision by the judge or involves an issue that was not presented to the judge. *Id.* The correction must be based on a note, memorandum, or paper remaining in the file or records of the court, rather than the personal recollection of the trial judge or some other person. *Jayko v. Fraczek*, 2012 IL App (1st) 103665, ¶ 29. Any document in the record may serve as evidence of the inadvertent nature of the omission, including hearing transcripts, but the evidence must be definite and certain. *Deutsche Bank National Trust Co.*, 2015 IL App (2d) 140970, ¶ 17. We review *de novo* whether an order satisfies the criteria to be a *nunc pro tunc* order. *Wells v. State Farm Fire*

¶ 51    Under these principles, we must determine whether dismissal of the GAL's amended petition for guardianship was included in the trial court's oral ruling on March 20, 2015, but inadvertently omitted from the written order that was entered on March 23, 2015. We note that, as of that time, there were three operative pleadings in the case: (1) Growe's second amended petition for relief under section 2-10(a) of the Illinois Power of Attorney Act (755 ILCS 45/2-10(a) (West 2012)), which sought a finding that Harper lacked capacity to implement the 2013 POAs and a declaration that Growe serve as her agent for health care based on the 2001 POAs; (2) White's cross-petition for appointment of guardian, seeking to have himself appointed as guardian of Harper's estate and person; and (3) the GAL's amended petition for appointment of a guardian, seeking to have independent third parties appointed as guardians of her estate and person.

¶ 52    At the conclusion of its oral ruling on March 20, the trial court stated that it had re-reviewed Growe's amended petition and confirmed that the only basis for revocation of the powers of attorney stated in that petition was Harper's lack of capacity, "[s]o that appears to conclude that petition." The court went on to state that, with the 2013 POAs being held valid, sections 11a-17 and 11a-18 of the Probate Act (755 ILCS 5/11a-17, 11a-18 (West 2012)), as well as another section of the Illinois Power of Attorney Act that the court could not recall at that moment, "would preclude the petitions — the cross-petitions for guardianship from going forward at this point." The court then directed the attorneys to draft a written order reflecting its ruling. At that point, White asked whether the trial court's "remarks about the guardianship petitions" needed to be included in the order also. The trial court responded:

> "If you want to consult further with [the GAL], that's fine. I tried to anticipate every
> further step that needed to be addressed in this case, and I think that if the finding is that

there are valid powers of attorney in place and there is no other reason that's been requested

under the pending 2-10 petition to seek to revoke those powers of attorney, then a guardian

cannot be appointed under 11a-17, 11a-18 *** and the section of the Power of Attorney

Act that I am just blanking on right now. *** So I think it would be appropriate to dismiss

them."

¶ 53    The written order that was thereafter entered on March 23, 2015, stated in part that, "The

Court having ruled that the March 2013 Powers of Attorney at issue herein are valid and

enforceable, Petitioner's and Cross-Petitioner's respective petitions for guardianship of Elizabeth

Jean Harper, Alleged Disabled Person, are dismissed." The order stated nothing about the GAL's

amended petition for guardianship.

¶ 54    When the case was next before the trial court on April 23, 2015, the trial court noted that

there were "a couple things up today" including the GAL's fee petition and the fact that the court

had reviewed the transcript from its March 20 ruling. After those matters were addressed, Growe's

attorney stated that the GAL's amended petition for guardianship was "still outstanding that the

Court's last order didn't address." The trial court responded, "Oh, my gosh, yes. That absolutely

should be dismissed. *** And that I think should be *nunc pro tunc* to the last date *** because that

should have been included. I wasn't even thinking of that amended. You are absolutely right." A

written order was then entered that day stating, "G.A.L.'s Amended Petition for Guardianship is

dismissed, *nunc pro tunc* to March 23, 2015."

¶ 55    We conclude that the trial court's entry of a *nunc pro tunc* order was proper in this case. It is

clear from the trial court's comments at the conclusion of the March 20 hearing that its ruling that

the 2013 POAs were valid meant that no legal basis existed to appoint a guardian under any of the

pending petitions for guardianship and thus all the petitions seeking that relief must be dismissed.

¶ 56    The trial court referenced two sections of the Probate Act and stated that they precluded the cross-petitions for guardianship from going forward in light of its finding on the validity of the powers of attorney. Section 11a-17(c) of the Probate Act, which involves guardianships of the person of disabled adults, states in pertinent part, "Absent court order pursuant to the Illinois Power of Attorney Act directing a guardian to exercise powers of the principal under an agency that survives disability, the guardian has no power, duty, or liability with respect to any personal or health care matters covered by the agency." 755 ILCS 5/11a-17(c) (West 2012). Section 11a-18(e) of the Probate Act, which involves guardianships of the estate of disabled adults, states in pertinent part, "Absent court order pursuant to the Illinois Power of Attorney Act directing a guardian to exercise powers of the principal under an agency that survives disability, the guardian will have no power, duty or liability with respect to any property subject to the agency." *Id.* § 11a-18(e). The trial court also referenced a provision of the Illinois Power of Attorney Act that precluded the petitions for guardianship from going forward, which it later clarified to be section 2-10(g), which states in pertinent part, "Absent court order directing a guardian to exercise powers of the principal under the agency, a guardian will have no power, duty or liability with respect to any property subject to the agency or any personal or health care matters covered by the agency." 755 ILCS 45/2-10(g) (West 2012). The trial court's citing of these three provisions indicates that it intended its ruling to bar relief under any of the petitions for guardianship and that all of them should be dismissed, including the GAL's amended petition. We see no basis for concluding that the trial court's reference to "petitions" or "cross-petitions for guardianship" generally in its oral ruling meant that it was contemplating only two of the three petitions should be dismissed.

¶ 57    On appeal, White and Harper cite to the trial court's statement at the April 23 hearing that it "wasn't even thinking of the amended" petition to mean that the purported *nunc pro tunc* order

was not merely correcting on omission in the record of something that had actually been done. Rather, they argue, as of March 23 neither the trial court nor any party "had in mind how or when to dispose of the GAL's own petition for guardianship and the petition remained actionable." We do not agree. We interpret the trial court's comments to mean that, when it reviewed the written order drafted by the attorneys, it had not thought of the fact that the attorneys had failed to include the GAL's amended petition for guardianship among the petitions set forth as being dismissed. We do not interpret the comments to mean that the GAL's amended petition for guardianship was entirely outside the contemplation of the trial court on March 23 when it ordered that the petitions for guardianship were precluded from going forward and therefore dismissed.

¶ 58    Our conclusion that the trial court and parties recognized that this had been an inadvertent omission from the March 23 order is further supported by what occurred at the hearing on April 23. It appears from the transcript that the failure to include dismissal of the GAL's amended petition in the written order was raised as a matter of housekeeping at the conclusion of other matters up that day. When this issue was raised, no party suggested that it was inappropriate to dismiss the GAL's amended petition for guardianship or that any further action needed to be taken with respect to that petition. Instead, the discussion proceeded to the necessity of an order formally discharging the GAL. When the trial court suggested that it believed that the dismissal of the GAL's amended petition should be *nunc pro tunc* to March 23, White said, "Right." No party objected or disagreed at that time. This leads us to conclude that the court and the parties recognized at that time that the dismissal of the GAL's amended petition for guardianship had been part of the trial court's ruling on March 20 but inadvertently omitted from the written order entered March 23. Accordingly, the *nunc pro tunc* order remedying that omission was proper, and the effective date of the dismissal of the GAL's amended petition for guardianship was March 23,

2015. *Kooyenga v. Hertz Equipment Rentals, Inc.*, 79 Ill. App. 3d 1051, 1059 (1979) (*nunc pro tunc* order takes effect as of the prior date).

¶ 59                     *3. Other issues remaining as of March 23, 2015*

¶ 60      Our third principal question on the finality of the order of March 23, 2015, is whether any substantive issues remained to be resolved in the case once the trial court determined that Harper had the legal capacity to execute the 2013 POAs, so as to prevent the order from being final. As discussed above, the GAL's unresolved petition for attorney fees does not prevent the order from being considered final. Also, our conclusion that the trial court properly entered an order that the dismissal of the GAL's amended petition for guardianship was *nunc pro tunc* to March 23, 2015, means that no issue concerning that petition remained in the case after that date.

¶ 61      However, White and Harper argue that there were other substantive issues in the case after the trial court determined that it had not been proven that Harper lacked capacity to execute the 2013 POAs. White and Harper look primarily to the pretrial order of March 25, 2014, arguing that it and the court proceedings thereafter contemplated additional issues being resolved than merely Harper's capacity to execute powers of attorney. They argue that these issues included White's own fitness to act as agent for power of attorney for health care under the 2013 POAs and the most appropriate health care plan for Harper in the future.

¶ 62      The problem with this argument is that, although these issues were discussed during the case as matters that might need to be resolved, they were never placed into issue by any pleading in the case. A circuit court lacks jurisdiction to adjudicate an issue not presented through proper pleadings. *IMC Global v. Continental Insurance Co.*, 378 Ill. App. 3d 797, 805 (2007). And a final judgment is " 'a determination by the court *on the issues presented by the pleadings*' " that ascertains and fixes absolutely and finally the rights of the parties in the lawsuit. (Emphasis added).

*Hernandez*, 2012 IL 113054, ¶ 47 (quoting *Flores v. Dugan*, 91 Ill. 2d 108, 112 (1982)). As the trial court noted at the conclusion of its ruling on March 20, the only basis pled for revocation of the 2013 POAs in Growe's second amended petition was Harper's lack of capacity. The trial court determined and resolved that issue.

¶ 63    Our review of the operative pleadings confirms that, with respect to removing any agent as power of attorney, Harper's lack of capacity to execute the 2013 POAs was the only issue raised by the pleadings. The only pleading that sought to invalidate any powers of attorney was Growe's second amended petition for relief. That petition was brought specifically under subsection 2-10(a) of the Illinois Power of Attorney Act, which contemplates the granting of appropriate relief upon "a finding by the court that the principal lacks either the capacity to control or the capacity to revoke the agency." 755 ILCS 45/2-10(a) (West 2012). Indeed, Growe's petition requested only a finding pursuant to 2-10(a) that Harper lacked the capacity to control or revoke the 2001 POA for health care or to control or implement the 2013 POAs. By contrast, no operative pleading sought to invalidate any power of attorney pursuant to subsection 2-10(b) of the Power of Attorney Act, which contemplates the revocation of agency if "the court finds that the agent is not acting for the benefit of the principal in accordance with the terms of the agency or that the agent's action or inaction has caused or threatens substantial harm to the principal's person or property." *Id.* § 2-10(b). Accordingly, White's fitness to act as agent under the 2013 POAs was never placed at issue by the pleadings in the case.

¶ 64    We recognize that there were several discussions where the parties and the trial court contemplated that matters not presently pled might need to be resolved in the future. For example, White's attorney acknowledged on May 5, 2014, that no issue concerning Harper's present health care plan had ever been raised in any pleading. The trial court acknowledged its understanding but

stated that it anticipated an issue to be raised regarding Harper's present health care plan "based on statements of everyone in court over all of these hearings." Also at that hearing, White's attorney reiterated that the sequence of determinations that had been set forth in the order of March 25, 2014, had been done "more out of a sequence of logic *** than any pleading." However, no amended pleadings were ever filed that put these matters at issue in the case.

¶ 65                                                        *4. Conclusion*

¶ 66        In conclusion, we hold that the trial court's order of March 23, 2015, constitutes the final judgment in this case. By ruling that Growe had failed to prove that Harper lacked capacity to execute the 2013 POAs, that the 2013 POAs were therefore valid and enforceable, and that the appointment of a guardian was therefore precluded under any of the petitions requesting such relief, the trial rendered a determination on all of the issues raised by the pleadings that ascertained and fixed absolutely and finally the rights of the parties to the case. See *Hernandez* 2012 IL 113054, ¶ 47. The fact that the written order omitted a reference to the dismissal of the GAL's amended petition for guardianship does not prevent the judgment from being final, because the trial court properly entered a later order dismissing that petition *nunc pro tunc* to March 23, 2015. Because the motion for sanctions was not filed by White and Harper until May 7, 2015, which was more than 30 days after the entry of final judgment on March 23, 2015, that motion for sanctions was untimely under Illinois Supreme Court Rule 137(b) (eff. July 1, 2013). The trial court lacked jurisdiction to consider the motion at that point and correctly dismissed it for that reason.

¶ 67                                          B. Cross-appeal by Growe and Pfeiffer

¶ 68        The cross-appeal raises two arguments: (1) Growe argues that the trial court erred by granting the motion for directed finding against her on her claim that Harper lacked capacity to execute the POAs; and (2) Growe and Pfeiffer argue that the trial court abused its discretion by dismissing

their motion for sanctions. However, our conclusion that the order of March 23, 2015, was the final judgment in the case renders this court unable to consider these issues.

¶ 69    The first issue raises a substantive challenge to the merits of the trial court's final judgment entered on March 23, 2015. However, just as we have concluded that no timely motion for sanctions was filed within 30 days of that final judgment, similarly no timely notice of appeal was filed within 30 days of that final judgment. Ill. S. Ct. R. 303(a)(1) (eff. Jan. 1, 2015). As no party filed a timely notice of appeal of that final judgment, Growe and Pfeiffer cannot thereafter substantively challenge it through a cross-appeal of the later order involving the trial court's lack of jurisdiction over the motion for sanctions. See Ill. S. Ct. R. 303(a)(3) (eff. Jan. 1, 2015); *American Dixie Shops v. Springfield Lords, Inc.*, 8 Ill. App. 2d 129, 136 (1955) (cross-appeal must be of same judgment appellants have appealed from).

¶ 70    As to the second issue, our conclusion that the trial court lacked jurisdiction to consider a motion for sanctions filed by White and Harper means that the trial court also lacked jurisdiction to consider the motion for sanctions by Growe and Pfeiffer. Accordingly, we have no basis to consider the trial court's substantive ruling dismissing that motion. *Kyles*, 359 Ill. App. 3d at 431-32. Although these challenges to our consideration of the cross-appeal were not raised by the parties, we note that at oral argument Pfeiffer agreed that a ruling that the order of March 23, 2015, was a final judgment would "torpedo" the cross-appeal and that a notice of appeal should have been filed within 30 days of that judgment in order to challenge it.

¶ 71                                III. CONCLUSION

¶ 72    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 73    Affirmed.